IN THE UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ALEXANDRA RIKAS, <br><br> Plaintiff, <br><br> v. <br><br> OFFICER THOMAS BABUSCH, Badge #908; OFFICER SALAMANCA, Badge #971; and NORTHEAST REGIONAL COMMUTER RAILROAD CORPORATION (a/k/a METRA), a municipal corporation, <br><br> Defendants. | No. 13-cv-2069 <br><br> Judge Sharon Johnson Coleman <br><br> Magistrate Judge Michael T. Mason |

**DEFENDANTS' LR 56.1(a)(1)(3)**
**STATEMENT OF MATERIAL FACTS**

NOW COME Defendants, OFFICER THOMAS BABUSCH, Badge #908; OFFICER SALAMANCA, Badge #971; and NORTHEAST [ILLINOIS] REGIONAL COMMUTER RAILROAD CORPORATION ([d/b/a] METRA), a municipal corporation, by and through their counsel of record, Associate General Counsel Stacey McGlynn Atkins, and pursuant to Local Rule 56.1(a)(1)(3), provide the following statement of material facts:

**VENUE & JURISDICTION**

1. This action is brought pursuant to the laws of the United States Constitution, specifically 42 U.S.C. §§ 1983 and 1988, and the laws of the State of Illinois, to redress alleged deprivations of the civil rights of the Plaintiff accomplished by the acts and/or omissions of the Defendants. [Dkt. 20, ¶ 1].

2. Jurisdiction is based on Title 28 U.S.C. §§ 1331 and 1343 as the Federal claims are brought under 42 U.S.C. 1983. The Court's supplemental and pendant jurisdiction of the state claims is invoked pursuant to 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b), as the parties reside in this district and the events alleged to give rise to the claims occurred in this district. [Dkt. 20, ¶ 2].

**PARTIES**

3. Plaintiff, ALEXANDRA RIKAS, at all times relevant, was a United States citizen and a permanent resident of the State of Illinois. [Dkt. 20, ¶ 3].

4. Defendant, NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION, d/b/a METRA (hereinafter "METRA"), was at all times relevant a municipal corporation chartered and organized under the laws of the State of Illinois pursuant to the "Regional Transportation Authority Act" (70 ILCS 3615/1.01, *et seq.*) and had statutory authority to employ sworn police officers. [Dkt. 20, ¶ 4].

5. Defendant Police Officer BABUSCH, badge #908, was at all times relevant and duly sworn police officer and employee of the METRA Police Department and was, at all relevant times, acting within the scope of his employment and under the color of law. [Dkt. 20, ¶ 7].

6. Defendant Police Officer SALAMANCA, badge #971, was at all times relevant a duly sworn police officer and employee of the METRA Police Department and was, at all relevant times, acting within the scope of his employment and under the color of law. [Dkt. 20, ¶ 8].

## MATERIAL FACTS

7. On May 8, 2012, Plaintiff and her then-boyfriend took a Metra train from Joliet to Chicago to spend the day together. [Deposition of Plaintiff Alexandra Rikas, attached hereto as **Exhibit A**, 36-37:17-13].

8. Plaintiff cannot recall if she consumed any alcohol prior to boarding the train in Joliet nor can she recall if she consumed any alcohol prior to arriving in Chicago. [**Exhibit A**, 41-42:23-2, 43:15-17].

9. Plaintiff cannot recall the first location she and her boyfriend went to, but does recall going to Navy Pier and a local garden; she does not recall consuming any food or alcohol while at Navy Pier. [**Ex. A**, 43:11-14, 44-46:18-23].

10. Plaintiff has no specific recollection of any other location they visited, nor can she say where she consumed any alcohol; she is sure she consumed more than five (5) alcoholic drinks, but cannot recall if she consumed more than ten (10). [**Ex. A**, 44-47:18-6].

11. Plaintiff considered herself intoxicated and admitted that she had "quite a bit to drink." [**Ex. A**, 53-54:5-11].

12. Prior to entering the LaSalle Street Station just after midnight on May 8, 2012, Plaintiff and her boyfriend purchased a pint of vodka to "keep the party going." [**Ex. A**, 57-58:10-7; Deposition of David Hakala, attached hereto as **Exhibit B**, 44:2-12].

13. As they entered the LaSalle Street Station, Plaintiff and her boyfriend were talking loudly and using profanity. [**Ex. A**, 59:5-16; Deposition of Defendant Thomas Babusch, attached hereto as **Exhibit C**, 68-69:9-15, 81:12-24, 89-90:9-3].

14. Plaintiff and her boyfriend entered the Station house so that he could use the bathroom; while in the Station house, the two were approached by a police officer who asked the boyfriend if the Plaintiff was okay; the boyfriend presumes that the officer believed

them, or at the very least the Plaintiff, to have been intoxicated. [**Ex. B**, 48-49:13-10, 51:10-14; **Exhibit C**, 81:12-21, 83:13-18; Deposition of Defendant Saul Salamanca, attached hereto as **Exhibit D**, 41-49:4-8].

15. Officer Salamanca spoke with both the Plaintiff and her boyfriend inside the Station house; he observed them both to be intoxicated, she being "extremely intoxicated…her balance was off…her eyelids were drooping. Her speech was heavily slurred….Her overall appearance was sloppy. Her hair was disheveled. Her clothes were not neat." [**Exhibit D**, 49:9-24, 51:3-21].

16. Plaintiff has no recollection of this interaction with the police while inside the Station house. [**Ex. A**, 60-61:16-9; 65:2-17].

17. Plaintiff's recollection is that she and her boyfriend boarded the train and sat in a completely empty rail car. [**Ex. A**, 62:8-21; 65-66:18-2].

18. Almost immediately after boarding the train, Plaintiff claims to have then fallen "asleep." [**Ex. A**, 66:3-13, 67:2-15; **Ex. B**, 57-58:19-1].

19. A passenger observed Plaintiff and her boyfriend board the train, he heard "screaming" and, shortly thereafter, "that's when the cop apprehended her…." [Deposition of Daniel Carrillo, attached hereto as **Exhibit E**, 7-8:14-3].

20. Officers Salamanca and Babusch were summoned to the rail car by other passengers; the officers boarded the train where they then observed the Plaintiff and her boyfriend. [**Ex. C**, 109:7-12; **Ex. D**, 53-54:23-6, 59:10-13, 64-67:6-24].

21. As the officers approached the train, they could hear people yelling. [**Ex. C**, 107:6-16; **Ex. D**, 69:13-17].

22. When the officers entered the rail car, they observed the Plaintiff and her boyfriend "clearly arguing" with "voices raised," yelling at one another. [**Ex. C**, 107:6-16, 118-119:12-16; **Ex. D**, 70:6-12].

23. After trying, unsuccessfully, to get the attention of Plaintiff and her boyfriend, one of the officers tapped Plaintiff's boyfriend on the foot and informed him that the two had to exit the train; the boyfriend did not ask why they were being ejected from the train. [**Ex. B**, 62:19-21, 63:8-24; **Ex. D**, 70-71:21-8].

24. Plaintiff's boyfriend told her that the police wanted them to leave the train; she observed the police "barely on the train, like they were right by the door." [**Ex. A**, 68:4-15, 69-70:22-5, 71:1-23; **Ex. B**, 59-60:20-1, 60:20-24].

25. When her boyfriend told her that the police wanted them off the train, she challenged as to why and Plaintiff's boyfriend told her "don't argue, let's go." [**Ex. A**, 73-74:19-11; **Ex. C**, 118:17-19; **Ex. D**, 72:10-22].

26. Plaintiff's boyfriend did not challenge the officers' commands. [**Ex. B**, 63:8-24; **Ex. D**, 72:10-22].

27. Prior to reaching the vestibule area of the rail car, Officer Babusch did not approach the Plaintiff nor did he speak to her; however, Plaintiff admits she "was arguing, like why are we going or what did I do, and I guess I was probably being loud or cussing and that's all I recall." [**Ex. A**, 75-77:15-21; **Ex. D**, 72:10-22, 73:10-14].

28. Plaintiff was upset and "bitching" that they would be stuck in Chicago and have to rent a hotel room; she refused to get up from her seat and while she was screaming, yelling and cussing, Plaintiff's boyfriend repeatedly told her to "calm down" and "shut up." [**Ex. A**, 77-78:5-24, 83:4-14; **Ex. B**, 65-66:13-6, 67:8-18; **Ex. C**, 122:5-23, 124:6-9; **Ex. D**, 72:15-19, 73:18-23].

29. The officers gave Plaintiff repeated commands to exit the train. [**Ex. D**, 118:5-8].

30. As they exited the train and Plaintiff continued to use profanity and yell, Officer Babusch stated, "If I hear one more word out of her, I'm going to arrest both of you." [**Ex. B**, 67:8-18, 68:7-23].

31. Plaintiff, her boyfriend, and the officers then made their way down the platform toward the Station house, all the while her boyfriend continued to try to calm her down. [**Ex. B**, 77:10-11; **Ex. C**, 119:17-24; **Ex. D**, 118:14-18].

32. Plaintiff was repeatedly warned by the officers that if she did not exit the train and station as ordered, she would be arrested. [**Ex. D**, 118:9-13].

33. As the officers, Plaintiff and her boyfriend walked the platform toward the Station house, Plaintiff continued to yell and scream and curse, until she refused to continue walking; Plaintiff then became "very animated, just flailing her arms around, swearing" at the officers; it was at this point that Officer Babusch informed her she was being arrested for trespassing. [**Ex. C**, 121:9-20, 125:4-11, 128:5-15, 136-138:4-23, 140-141:14-21; **Ex. D**, 74:8-16, 75-76:24-12, 76-77:17-21, 80:3-13, 89-93:16-13, 94-95:7-24, 113-114:8-2, 114-115:21-21, 119:6-13, 120:6-24].

34. Officer Babusch was holding Plaintiff's hands behind her back and that was when "he was just holding her, and then she was kicking and screaming away from him, not kicking him or anything, but she was like, you know, flailing her legs up in the air," "she was trying to get away," "swinging around," "kicking and screaming," "and then that's when he put her to the ground, put his knee in her back and then put handcuffs on her." [**Ex. E**, 8-9:16-23, 10:15-23, 26:1-11].

35. While Officer Babusch was attempting to handcuff the Plaintiff, she became non-compliant and "very combative and hysterical…screaming and spitting, kicking her legs and feet." [**Ex. C**, 145:9-24, 147-148:3-6, 149:6-15, 149-150:19-7; **Ex. D**, 77:5-21, 81-82:18-2, 89-90:16-12, 99:4-18, 100-101:19-21].

36. Even after she was on the ground and in handcuffs, the Plaintiff continued to kick her legs, squirm on the ground, and tried to roll away. [**Ex. B**, 93:4-6, 18-22; **Ex. C**, 146:10-

21, 148:2-6, 150-151:23-14, 155-157:13-1; **Ex. D**, 81-82:18-18, 83-84:19-9; **Ex. E**, 28:17-22].

37. Officer Babusch kept Plaintiff secured on the ground for approximately 10-15 minutes, holding her in an attempt to control her movements and to stop her from continuing to kick and spit, while they waited for an ambulance to arrive. [**Ex. C**, 144-145:5-8, 151-153:6-24, 156-157:22-1; **Ex. D**, 83:19-24, 85-86:13-12, 121:8-18].

38. Officer Babusch called for his dispatch center to summon the Chicago Police and Fire Departments to arrive. [**Ex. C**, 159:15-19; 173:7-20].

39. Chicago Police Department personnel also arrived at the scene. [**Ex. C**, 172-173:7-6; **Ex. D**, 104-105:14-20].

40. Plaintiff has no recollection of how she was taken to the ground or how she sustained any physical injuries. [**Ex. A**, 92-93:17-9].

41. Chicago Fire Department EMT personnel arrived at LaSalle Street and observed an "agitated" Plaintiff, "yelling, swearing, [and] cursing;" she was not following direction and was uncooperative. [Deposition of EMT Carol Thornton, attached hereto as **Exhibit F**, 10:11-20, 11:1-4].

42. Even after she was placed and secured into the collapsible chair for transport, Plaintiff was not cooperative, spitting, screaming and flailing her arms, kicking, trying to get out of the chair, and moving from side to side, making it difficult to get her down from the platform to the ambulance. [**Ex. F**, 12:2-11, 13:2-14; Deposition of EMT Arlett Payne, attached hereto as **Exhibit G**, 18:6-17; **Ex. D**, 86-87:22-4].

43. A sheet was placed over the Plaintiff by the EMTs to keep her from spitting saliva and blood on persons nearby. [**Ex. D**, 106:13-21].

44. Upon first encounter with the Plaintiff, the EMTs detected signs that the Plaintiff was intoxicated either by alcohol or drugs, including her bizarre behavior, swearing, yelling, not cooperating, kicking at officers and flailing her arms. [**Ex. F**, 15-16:7-13, 17:1-16; **Exhibit G**, 14-15:20-20, 18:6-17, 23:14-18].

45. The EMTs could not even take the Plaintiff's vitals or obtain her personal information at the scene because she was too combative. [**Ex. F**, 17-18:18-1; **Ex. G**, 18-19:23-9, 21-22:19-10].

46. At Northwestern Memorial, Plaintiff arrived into the Emergency Room screaming, yelling "She gave me bad drugs! I don't know what she gave me, but it's fucking me up!," and was so aggressive/combative with the staff that she was placed in four-point restraints and required "extremely potent" sedation. [Deposition of Geoffrey Bauer, M.D., attached hereto as **Exhibit H**, 11:11-24, 16-17:18-24, 18-19:22-16, 21-23:19-18, 27-28:4-24].

47. Plaintiff was diagnosed with acute alcohol intoxication, a single Ellis Type 2 fracture to a front tooth, as well as bruising to her knees, with no other signs of trauma. [**Exhibit H**, 11:11-24, 12-13:21-3, 14:3-11, 32-33:23-2].

48. The ER staff was unable to review Plaintiff's symptoms with her because of her agitation. [**Ex. H**, 11-12:23-1, 14:3-11, 16:12-17].

49. Plaintiff's drug screen was positive for opiates and her Blood Alcohol Concentration was measured at 0.277; the legal limit in Illinois is 0.08[1]. [**Ex. H**, 21:3-17, 23-24:19-2].

50. At the hospital, Plaintiff was charged with one count of trespass to a railway, after refusing to leave the train station despite several warnings/commands to do so by both police officers on the scene. [**Ex. C**, 142-143:2-17; **Ex. D**, 88-89:15-15].

51. The decision to charge Plaintiff with only one count of trespass was due to her psychiatric issue and high level of intoxication. [**Ex. C**, 185-187:21-22].

52. Once the officers wrote her the citation, she was no longer in their care and custody, rather she was in the care of the hospital. [**Ex. C**, 188-189:4-8].

53. Plaintiff was discharged from the hospital early the same morning of her arrest, May 9, 2012. [**Ex. A**, 85:9-13].

54. On November 12, 2012, approximately seven (7) months post-incident, Plaintiff first saw a dentist at Shorewood Family Dental to examine her claimed dental injuries; however, after receiving a cost quote, Plaintiff did not return for treatment. [Deposition of Robert Funk, D.D.S., attached hereto as **Exhibit I**, 9:1-4, 21:17-22].

55. Plaintiff next visited a dentist at Advanced Family Dental of Shorewood on December 17, 2012, approximately eight (8) months post-incident, and on December 28, 2012, underwent a root canal for an infected front tooth. [Deposition of Lisa Worthley, D.D.S., attached hereto as **Exhibit J**, 22: 11-17, 23:12-16; Deposition of Charles Patterson, D.D.S., attached hereto as **Exhibit K**, 8:15-20, 12:8-11, 18:3-21].

56. Plaintiff did not seek any dental care or treatment between May 9, 2012 and November 12, 2012, despite being provided a listing of dental clinics by Northwestern, and she has not received any further medical or dental treatment since January of 2013. [**Ex. A**, 102-103:18-19, 107:3-10, 108-109:13-2].

57. Plaintiff was found not guilty of the charge of trespass to a railway, and was told by the Judge in his ruling that there were five or six other criminal charges that she should have been charged with. [**Ex. A**, 98-100:9-2].

58. Plaintiff has no recollection of events from the moment she was about to step off the train to when she awoke in the hospital including: how she fell to the ground; how she sustained her claimed injuries; kicking at the police; being placed into custody; the

---

[1] Per the Illinois Vehicle Code, 625 ILCS 5/11-501(a)(1), of which this Honorable Court may take judicial notice.

ambulance personnel arriving; spitting, kicking, screaming at the ambulance personnel; having to be restrained by the ambulance personnel; screaming, yelling, and kicking at staff at Northwestern Memorial; nor does she recall having to be sedated at the hospital. [**Ex. A**, 79-81:10-17].

                                      Respectfully submitted,

By:    /s/ Stacey McGlynn Atkins
          Associate General Counsel, Metra
          One of the attorneys for Defendants

Stacey McGlynn Atkins
Associate General Counsel
Metra – Law Department
547 W. Jackson Blvd., 15th Floor
Chicago, Illinois 60661
312.322.7773
satkins@metrarr.com